Hear ye, hear ye, this Honorable Appellate Court for the Second Judicial District is now open. The Honorable Robert E. McLaren is resuited. Your Honor, the first case on the docket this morning is 2-23-0221. Maciej Wysniewski, plaintiff, v. Jessica Kellenberger, et al., defendants. Maciej Wysniewski, plaintiff, v. Boscow Asylum Association, defendants, Appellee. Arguing on behalf of the Appellate, Mr. Brian McManus, Jr. Arguing on behalf of the Appellee, Ms. Linda M. Halsrechter. Thank you. Ms. McManus, you may proceed. Thank you, Your Honors. Good morning. Good morning. Your Honors, Rule 137 for the Illinois Supreme Court to impose sanctions on a plaintiff's lawyer is supposed to be when I abuse the judicial process. The factors are to harass or cause a necessary delay. My opponent, in her reply, admits that I did not cause a necessary delay. In fact, Your Honors, I sped up discovery orally by taking a number of oral discovery depositions that I usually never do before I had received written discovery. The other problem of Rule 137 is a needless increase in costs upon another party, which I think I can explain to Your Honors why I do not believe that's the case. Why did I believe the case was reasonable, Your Honors? Well, I had a client that struck a horse and is permanently brain damaged for the rest of his life. He was incapable of speaking to me for three months while I was in Lutheran General. He's still incapable of giving me any type of answers at all about what happened, how this occurred. I was approached by his wife. The issue, I think, is why did you join the FVSA? And I'm not aware that your client could necessarily relate to you facts regarding the involvement because the accident happened on a road, not on the property. And I think it wasn't even necessarily near proximity. So the fact that your client is having difficulty conveying relevant facts in the case doesn't seem to be a correlative argument that would rationalize your claim argument that the trial court committed an abuse of discretion when it assessed fees against you. And in reply, may I reply? Sure. When I talked to my client's wife, I drove out to the accident site myself. I spent two hours there. If I'm standing here, Your Honors, Ms. Kallenberger's house is about 100 feet past the TV to my right. Fox Valley Association is behind her bailiff 100 feet to your left. Both have massive, well, Ms. Kallenberger has a stable of about five horses. Fox Valley Riding Association has a stable of about 60 horses. But there are no horses there. At the time that I was there, there were no horses that were there. However, if you look where the horse broke out of to where it was hit, it had to cross Fox Valley Stable Association's property to get to where it was unless it was playing a video game. But I didn't just stop there, Judge. But isn't the point to do the investigation before you file a complaint against a defendant? I did do the investigation. And how did you conclude that the horse had any connection to Fox Valley? Well, after I looked at the two properties, I went on to the Internet and did an Internet search. And I pulled up an entry form for Fox Valley Saddle Association, an event they were having. And on the form, it said, mail in your registration form and your check to Jessica Kallenberger at her address next door. And not only did that, Judge, I went over their social media, where on their social media, Fox Valley refers to our Jessica Kallenberger. Our Jessica Kallenberger is teaching a case. I asked the witness, Julie, can I, I said, if you read this, Julie, would you assume a connection between. And she, of course, is not an attorney under any obligation to make those connections that you are. And she said yes. She said I could I could read that. This isn't looking back in hindsight. This is looking at what I'm looking at at the time of the accident. Rule 137 is pretty clear. We're not to look at this in hindsight. We're looking at pursuing this in good faith. And the first thing I was taught, Your Honor, 30 years ago by my mentors was to start getting things under oath as soon as I could, especially when I had such a devastating injury as I did to this client. I drove out and investigated. I spent three hours on the Internet looking at information. This wasn't something I did willy-nilly. I looked at the proximity. I looked at where the horse ran from. I looked at the direction. Counsel? Yes. It seems that, assuming arguendo, that everything you did was reasonable at the time, what did you do after you received notice that the association didn't have any horses on the day in question that Laredo ran? I received a letter from opposing counsel that I had sued the wrong person and that she should dismiss me. If I did that with every personal injury case judge that I have right now, I'd have very little defendants. I asked my opponent if I could get Ms. Knife's deposition. Upon getting her deposition, I told my opponent that I would be happy to voluntarily dismiss her at the time. Without prejudice? Without prejudice. And? She refused because. Withdrawing the motion? Withdrawing. No, I didn't condition that. My opponent said she wished to pursue the motion for sanctions, and she wished to pursue her argument. I didn't make any condition that I'll voluntarily dismiss this if you withdraw yours. In fact, there's nowhere in the record where that could be shown, other than me as an officer of the court telling you three justices that that wasn't what happened. Well, you said it wasn't on record. Was it off the record? Did it take place off the record? I never had an off-the-record conversation with Linda saying that if she did this, I would voluntarily dismiss her. I did. I did not. I kept going along with my case. I kept trying to give my clients answers whose father is essentially God, and sometimes. But the nature of the injury, I mean, if it's not this defendant, the magnitude of the injury really has no relevance here. Well, I mean, one of the cases that cited Judge in awarding sanctions is a case where the information was readily available to the attorney by simply asking his client whether or not this driver was a reckless driver. And you could add a negligent entrustment action, which this lawyer did in the case I believe was, I know it's cited, Judge. But that's the case where they said the lawyer, Ashley v. Scott, where the lawyer did a negligent entrustment action. And they said, well, you could have just asked your client. She would have told you that this person wasn't a crazy driver. So I didn't have the opportunity to do that. But I did have the opportunity to view the proximity of the accident site. I did walk the 1.8 miles it was from the house to where my client was hit. Like I said, it's a straight line that goes right across the driving association's property from where Ms. Kellenberg's house is to where the accident occurred. And... When you filed the suit, practically, what, two weeks or so after the event? I did. You waited a few more weeks and done the investigation before bringing the defendant in? I don't, you know, Judge, I don't think so. Because my clients were being threatened to be kicked out of their hospital because they didn't have any type of medical insurance at all. He was going to be there for three, three and a half months. And I was instructed by my clients to get off my butt and start moving and do my job. And find out, number one, who was responsible for their husband's demise or permanent brain damage. And they wanted answers. They wanted to know if folks had medical payment coverage. They wanted to know answers from me about what I was doing on behalf of the injured person. And as I mentioned to you, I wanted to dismiss them without prejudice. At the time that I wanted to dismiss them, and I said, I deposed Julie, I'll voluntarily dismiss Jessica. It was $2,000 is what her fees were at the time. And she said, no, I'm going to have my motion for sanctions heard. And she attended every liability deposition that was taken thereafter. Every one. Well, wouldn't Fox Valley be entitled to have an attorney present? It would. But after an attorney has already told you, aye, aye, I'm dismissing your case voluntarily. But not without prejudice. That's a hollow promise, isn't it? I don't think so. I personally don't think so. You could have done it with prejudice then. I mean, you're sort of trying to argue both sides here. I was going to non-suit it, but, you know, I could have brought that client back in. And in the meantime, any of these depositions or things that you've done, counsel wouldn't have been there. If we're going to set a precedent here that attorneys like myself, who's never had a sanction against them in 30 years, I've been practicing law for 30 years, gets hit with a $13,000 sanction on a case where he personally drives out for two and a half hours, investigates it, goes onto the Internet, reads as much as he can, makes himself as intelligent as he possibly can on this issue. And the moment that I called out under oath in an affidavit form that they were not involved, I said, let me dismiss you without prejudice.  But I'm charged to zealously advocate on my client's behalf. I have a client that can't talk to me. I have these two places that are in close proximity to each other. And I have blasted all over the Internet to anybody that would read it. Anyone, a third grader, would say to themselves, Jessica Gallenberger and Fox Valley are associated with each other. I mean, there's no other way you can read it. I mean, how do you read our own? How would you possibly interpret that to mean anything other than she's a part of Fox Valley Riding Association. She rides over there all the time. I have a redacted police report two weeks out that just gives me the owner's address. I have clients that are asking me tough, hard questions about a seriously injured family member. And I am trying to zealously advocate. That's what the Supreme Court charges me with. They also charge me with doing a reasonable investigation, which I believe I did. I didn't pull this off, Judge. Don't you also have the ability to make them respond in discovery? I mean, couldn't you have taken that route? File a petition for discovery, Your Honor. Yes, I could. That's hindsight. We're looking back at it again. But she would have, I'm sorry, my opponent would have incurred the same legal costs by answering a complaint for discovery as she did answering the parents as she did in the fashion that we had up until the $2,200 mark. And at the $2,200 mark, the case would have been dismissed. But yes, in hindsight, if we're looking at it in hindsight, I would have had the right to file a petition for discovery and ask them that. I mean, that's hindsight. And you have to look. Rule 137 specifically says it looks at it from my eyes, my point of view. What do I think is reasonable? Any other questions? No, sir. No. Thank you. Sir, you'll have an opportunity to make rebuttals. Thank you, Your Honor. Ms. Holder. You may proceed. Good morning. May it please the Court, Counsel. I think the law is pretty clear. I don't think there is much dispute on the 137. However, I will disagree with Mr. McManus. It's not a subjective standard. It's an objective standard. Our issue has always been clear that we're contesting whether they had enough facts before they filed the complaint. That's the first part. We've never claimed that they were malicious or vexatious or harassing. When I first learned that Fox Valley Association had been sued, my first question was, why? Obviously, Fox Valley knew it had nothing to do with it. So I immediately wrote Mr. McManus a letter letting him know that we had nothing to do with it. I wanted to try to circumvent fees. I did it before we even had to incur an appearance fee. I talked to Mr. McManus on the phone. He told me at the time his connection was that Jessica Kellenberger was a member of Fox Valley and that through discovery he would determine whether Fox Valley is otherwise involved. So I immediately filed a motion to dismiss the motion and included a motion for sanctions. At that point in time, my fees were roughly $2,000. I attached an invoice. Mr. McManus, let me kind of jump real quickly to the motion to voluntarily dismiss. First of all, our motion had already been filed. He could have just agreed to the entry of that motion. Second of all, it is not correct. I had no conversations with Mr. McManus about dismissal or being assured that we were going to be dismissed. And I did cite this in the brief. On my reply to Mr. McManus's plaintiff's response to our motion for sanctions, I did include an email exchange with his associate. That reply of ours starts at Record of Proceeding 507, page 507. That email exchange is contained in Group Exhibit F. And specifically, his associate is telling us he is willing to voluntarily dismiss if we drop our motion for sanctions. And that email exchange is right there. In addition, the motion to voluntarily dismiss, it specifically asks that the parties bear their own attorney's fees. And I wasn't agreeable to that. That would serve to undermine our motion for sanctions. So it was a disingenuous motion as far as I'm concerned, potentially strategically filed to be able to try to circumvent or stop attorney's fees from accumulating or give them that argument. I don't know. But I think also it's telling that Mr. McManus's plaintiff would not let the motion to dismiss get resolved at the time I filed it. He wanted to continue having depositions before he would have any motions to dismiss heard. That, to me, suggests that he did not have the facts to begin with when he filed the complaint. And as you can tell by the complaints, he's alleging that Fox Valley Sales Association actually had control over this horse, managed this horse, was somehow negligent in its care. And he had no facts that suggest that. To say that Fox Valley and Jessica Kellenberger were in close proximity to one another, that's not enough. The accident, the horse was actually struck about a mile away. If he were there, the horse didn't have to go across Fox Valley property, not that that's relevant. It could have gone down roads. There's other farm fields. And these posts that Mr. McManus is talking about regarding Jessica Kellenberger, and there are copies in the materials, they were old posts. I think there are two posts that she was – as part of Fox Valley Sales Association, we are a volunteer group, not-for-profit. It's been around 78 years. Members can bring horses here to ride, to make money. We have membership dues, plus we also rent our grounds to third parties to rent. We also have shows ourselves. We do not board horses. Fox Valley has never boarded horses. And I think in the reply they suggested that we had admitted or acknowledged that Fox Valley boards horses. It never has. That means you actually are responsible for the care and you get paid to do that. We've never boarded horses. I also had filed a motion to correct the record. And there was a misstatement also in the reply brief suggesting that Jessica Kellenberger rode on the property. She was not the member that was being referred to. The correction, I did file a motion that said it would be brought up. You're talking about somebody riding every day on the property? Yeah. And whether this is relevant or not is another issue, but it's just a factual misstatement that Jessica Kellenberger was not the person who rode daily. But getting to Mr. McManus's point about needing to file this immediately to preserve evidentiary materials or whatever, he already had Jessica Kellenberger as a defendant. So he could have filed the complaint within two weeks. He could have just named Jessica Kellenberger. He did not have to name Fox Valley Saddle Association at the same time. And you mentioned the pre-litigation disparity. He could have under Rule 224 proceeded that way first. And he acknowledged in his pleadings that he could have done that. Specifically, 224 is designed and is only appropriate when you do not have enough information to sue a party. And he admits he could have done it that way. And 224 would have prevented the fees, us hailing litigation fees, Fox Valley, because there would not have been a complaint filed yet. And also under 224, it specifically says that the plaintiff in this case would be responsible for the costs incurred by the potential defendant to respond to the 224 petition. So that's, you know, that's not quite right. But, yeah, he probably should have proceeded under 224 rather than what he could have done or should have done. Don't we look at this from that point then, looking forward, as opposed to Monday morning quarterbacking, what he could have done? Well, I think it suggests that he, I think the fact he acknowledges he maybe could have or should have is essentially an admission that he did not have, he didn't have the facts to sue Fox Valley. Because it's an appropriate mechanism only if you do not have enough information to sue a party. Specifically, 224 says the person or entity who wishes to engage in discovery for the sole purpose of ascertaining the identity of one who may be responsible and damages may file an independent action for such discovery, reasonable expenses of complying to be borne by the person seeking the discovery. So it's actually for the sole purpose of determining that. Another thing he could have done is just waited until he learned from other discovery what potential, if Fox Valley was involved. But you're right, there's two things here. One thing is what did Mr. McManus know before he filed. But then I think the relevance of what happened afterwards is he had an ongoing duty to dismiss Fox Valley as he learned these facts, and he never did. And again, we were involved in the case and had to stay in the case until we were dismissed. And he proceeded to have five depositions and a site visit. In fact, it was at the site visit, which is like February 28th of 2023, that I approached Mr. McManus and said, you know, are you at this point agreeable to signing an agreed order dismissing Fox Valley with prejudice? He said, yes, I am. I prepared the motion and I prepared the agreed order, Mr. McManus signed it, and that was entered by the judge. I purposely also did not do anything to really incur additional fees where I didn't need to. I didn't initiate any discovery. My fees really were incurred just because of the actions I had to continue taking. So the original invoice was, again, as of my filing, a combined motion to dismiss and motion for sanctions. But there was a lot that happened after that. Not only the discovery, but also then Mr. McManus at some point then, when he agreed, when we dismissed Fox Valley by agreement, we preserved the motion for sanctions. So that was the only matter left for Judge Bowles to hear. And then I had to also reply to his response. Then there was a motion to reconsider, which the judge, I asked for fees. The judge declined to award me fees for participating in the motion to reconsider. But even in the motion to reconsider, there's some discussion whether there should have been an evidentiary hearing by Judge Bowles. They did not ask for one in their motion to reconsider. They replied to our response and never did request an evidentiary hearing. I think Judge Bowles cited some case law about why it wouldn't have been required. But, and also there was, this is, again, more evidence that Mr. McManus had after he filed the complaint that would have showed him that he should have dismissed us. There was also a motion, a complaint for declaratory judgment that was filed by Jessica Kellenberger's insurance carrier. Mr. McManus was, had appeared and was a party to that. In that complaint, the insurance carrier alleged that Jessica Kellenberger had possession and boarded the horse. Ms. Kellenberger also responded and answered affirmatively. She admitted that the horse was in her current possession. Again, Mr. McManus, based on learning that information, didn't proactively proceed to dismiss. Again, Mr. McManus's, might be he said, she said, did not assure me he was going to dismiss Fox Saley ever. And plus, as you all are aware, until we're actually dismissed, I'm not going to take anyone's word for it that we're going to be dismissed. But, you know, I guess that's pretty much all I have to say, trying to make these factual arguments and trying to clarify. And again, all these extensions of time to allow Mr. McManus to conduct depositions, that was Mr. McManus asking the judge to do that. We didn't ask for it. We didn't continue this matter. Again, we were ready to proceed with our motion to dismiss right when we filed it. It was Mr. McManus who wanted to discover more information before he responded. And again, like I point out, if we had agreed to voluntarily dismiss, it was based on their request that we bear our own attorney's fees. And that's in the, if you see the motion of voluntarily dismiss, you'll see that as a prayer for relief. And again, I pointed out the e-mail exchange to you, whereby it specifically says that Mr. McManus was not going to agree to, the motion to voluntarily dismiss was contingent upon Fox Saley dropping its motion for sanctions. And that's in the e-mail exchange. And no one's refuted that, and it's true and accurate. And... Well, I would probably have to research that further. My, I would be inclined to want a final motion. I don't think anything that they brought up in their appeal is different than what the record showed. I don't think they made an argument that the law was misinterpreted, that there is some piece that would justify, that would, I don't know, somehow mitigate the circumstances. I also think there's some misrepresentation. Well, I'll just let the record speak for itself in terms of who said what to whom. But I think this is a fairly, I think this is a fairly egregious case. We, Fox Saley, try to give as much opportunity to Mr. McManus to let us out of the case as possible. And my fees were only billed at $200 an hour. I tried to do everything I could to contain the fees. As the case law says, everything that, all the fees that are incurred as a result of frivolous filing should be compensated. And but for the frivolous filing, I would not have had incurred attorneys. It was on behalf of the Fox Valley Sandals Association. You know, so I would say under my reading of 325B, I think it is right, and some of the preliminary research that I did, I certainly think the case is appropriate for that. And I would be glad to file a motion, or not be glad, if it would be helpful. I know the panel could do on its own, could find that, that there is potentially a violation of that rule here. But I could also file a motion to that effect. But I do think the time I've spent here in responding, when there's nothing new, and the same arguments were made, and Mr. McManus has said to you right now that it's pretty clear that Fox Valley should not have been a party. Maybe he, and he also made a claim in his pleadings that he thought, I thought, I think. And even the thing about the agency, it was confusing. At one point, he, in the original two complaints, he made no connection between Fox Valley and Jessica Kellenberger. So Jessica Kellenberger mismanaged the horse, Fox Valley mismanaged the horse. Then he said, within his pleadings, that he said the reason he didn't allege an agency relationship, because he did not have enough facts to allege it, and he thought that that would be a Rule 137 violation if he were to have alleged it. So there's a lot of contradictory statements throughout his pleadings. You know, as an attorney who tries to be very careful, I would certainly never bring a lawsuit against a party if I wasn't really sure that at least there were facts that backed it up. This is an expensive ordeal. I mean, this is a volunteer organization. It works hard. Everyone volunteers their services to make money, to do the work. This is a significant expense. Plus, Fox Valley specifically avoided reporting it to its insurance carrier because it didn't want to red flag its account. Insurance for these sorts of facilities, when you're running, are very expensive. So that's a potential expense that we try to avoid by not reporting it. But this is serious. When you decide to sue someone, you should take it very, very seriously. And I don't think there's any justification for them to jump the gun as they did, and it just caused Fox Valley a lot of expense. I do have one question. Counsel spoke a lot about his obligation to zealously represent his client on one hand and Rule 137 caveats on the other. Which trumps? Well, again, it depends, right? In this case. Yeah. In this case, I think the Rule 137, first of all. Why? Because, first of all, he already had the complaint filed against Jessica Kellenberger. So what the situation was, it was not relevant to joining Fox Valley Sale Association. And he obviously was aware of Fox Valley Sale Association right early on. He could have immediately done discovery. He could have found out more about Fox Valley. He could have done their Rule 224. So there weren't a lot of options. Right. Isn't bringing Fox Valley in, given the connection on the Internet and the proximity to the location of the accident, reasonable under the circumstances? I don't think so, because, first of all, the Internet information that was being discussed or presented, nothing to do with this incident. I think the facts had to do with this incident. If someone had told him I saw the horse at Fox Valley, Jessica Kellenberger told me she had the horse at Fox Valley when this happened. Or if someone had witnessed it. But to just say that someone had some connection because of an old Internet post, too. The one post is, yes, Jessica Kellenberger was the secretary of a horse show. That's one of the ways we make money. Her role was to answer questions for competitors who enter the competition. That's it. It was like one or two years prior to the incident. The other post he mentions was Jessica Kellenberger volunteered her services at a local library on storytelling hour. Fox Valley was just because she's a member. They gave them like a high five, a congratulations to our own Jessica Kellenberger for having participated. I think the connection has to do with the incident. What connection does that have with boarding this horse or this horse getting loose? Plus, Fox Valley Saddle Association does not board horses. If Mr. McManus potentially checked the website, which the website of Fox Valley Saddle Association has been up for many, many years, he could have gleaned that. They just don't board horses. Thanks. Thank you. Thank you very much. Mr. McManus, you may proceed. Thank you, Your Honor. Your Honors, there was not any condition posted upon voluntary dismissal. I'm going to just say that. You look through the record. Find anywhere where I talked to Ms. Goldswing or wherever I said I'm not going to enter this. I told her I'm going to enter this. The fact that I have to come in front of this panel as a lawyer doing my job, working for my client, trying as hard as I can to figure out what happened to him so I can give an explanation to this family about who's at fault for the loss of their father. Rule 137 asks you to look at what led up to my filing, not what happened after my filing. What led up to my filing is I meet with my clients. They instruct me to find out as much as I can. I drive to the accident site. I walk them. I walk stables there. I look at the path that the horse took. I mean, this is, Rule 137 is supposed to be a bulwark against frivolous litigation and not a penalty against unsuccessful litigants. I can assure all three of you that I ripped my tail off before I added the word to this writing association. I went there and I did a reasonable and a hard investigation. Linda is saying that she's just not going to take my word for it that I'm going to voluntarily dismiss her. That was in her argument to you, Your Honor. She's not going to take my word for it, so I'm supposed to take her word for it. When I get a letter from her one week after I file a complaint telling me on a handwritten letter that I sued the wrong person. When I have all of these, which everybody testified to. If I read this, I would think that Ms. Kellenberger is involved with the horse. How do I know they own a stable horse? There's stables there everywhere. How do I know that Ms. Kellenberger's stable isn't there? I have to do something. I have to do discovery. Right, but you did the discovery after you filed the complaint against Fox Valley. That's how it works, Judge. You do an investigation on your own as a lawyer and you try to come to a reasonable inference on behalf of your client of what you think a responsible party could be. What is the reasonable connection between Kellenberger and Fox Valley? I mean, I repeat myself, Judge. The internet connections, proximity, the fact that she's a member, the fact that she refers to, they refer to Fox Valley as Jessica being our own. I don't know any other way you could read this unless, you know, you say you don't know what the definition of the word is. I mean, she defines herself as our... What about the declaratory judgment where the insurance company alleged that Ms. Kellenberger was the one who had control of the horse? Yeah, that came, I think, a month and a half after I filed my case, which I'm a part of that too, which was the declaratory judgment action was denied right now. It's on, you know, the declaratory judgment was denied. I'm sure that's not in front of your honors, but... When you say it was denied, what do you mean? Well, they brought a motion for summary judgment, the insurance company. Declaring what? Declaring that their policy didn't apply. Okay. And they denied that motion. Did they allege that Ms. Kellenberger was in control of the horse? In the declaratory judgment action? They did. Those pleadings are also well, well after what we're talking about here, especially the only relevant thing is what I felt in the two weeks leading up to the event. We're not looking at hindsight things here. The court makes it clear. And I didn't even get an evidentiary hearing before the trial court to explain my position. Did you ask for one? The original complaint that I filed, the original motion that was filed, the judge set a hearing date. When you set that date, when a judge sets a date for a hearing, I expect there to be a hearing. Two weeks before the hearing occurs, I get a motion sent to me by the judge that says, here you go, you're set for $13,000 without me having any ability to tell the trial judge anything that I just told you. So yes, I got a hearing date. She just didn't honor it and didn't give me a chance. I appreciate your consideration, Your Honors, and I hope you have a nice day. Thank you. Any other questions? I have no additional questions. Thank you.